484 So.2d 816 (1986)
Juanita MOTTON
v.
TRAVELERS INSURANCE COMPANY, Ascension Parish Emergency Ambulance Service District and Ascension Parish Police Jury.
Audrey L. FAVORITE
v.
STATE of Louisiana Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Gail Lynette A. FAVORITE
v.
STATE of Louisiana Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT.
Nos. CA 84 1296-CA 84 1298.
Court of Appeal of Louisiana, First Circuit.
February 25, 1986.
Rehearing Denied March 31, 1986.
*818 Cyrus J. Greco, Baton Rouge, for Juanita Motton, plaintiff-appellee.
Amy E. Counce, Baton Rouge, for Mary Jones, Eldora Garrett Thomas, Eloise Motton Walker, Isaac Motton, Jr. and Leola Garrett James, defendants-appellees in intervention.
Grayson Brown, Baton Rouge, for Travelers Ins. Co., Ascension Parish and Emergency Ambulance Service Dist., Defendants-appellees in intervention.
W. Arthur Abercrombie, Jr., Baton Rouge, for Travelers Ins. Co., defendant-appellee.
Gordon Crawford, Gonzales, for Ascension Parish Police Jury, defendant-appellee.
Stephen C. Riedlinger, Baton Rouge, for Juanita Motton, plaintiff/appellee.
Raymond Gautreau, Donaldsonville, for State Dept. of Transp. and Development, defendant-appellant.
Arion Boyle, New Orleans, for Gail L. Favorite, plaintiff-appellant.
Before LOTTINGER, COLE and CRAIN, JJ.
COLE, Judge.
The primary issues presented in this appeal are whether a rut on the shoulder of a state highway was a cause in fact of the subject vehicular accident; whether comparative fault is applicable in cases such as the present ones, involving a highway shoulder defect; and, quantum.
This matter involves two consolidated wrongful death and survival suits filed, respectively, by Audrey Favorite, the mother of decedent Rita Jackson, against the State of Louisiana, through the Department of Transportation and Development (State) and by Juanita Motton, the half-sister of decedent George Hardy, against the Ascension Parish Police Jury, the Ascension Parish Ambulance Service and its insurer, the Travelers Insurance Company (Travelers).[1] A petition of intervention was filed in the Motton suit by Mary Jones, Eldora Garrett Thomas, Eloise Motton Walker, Isaac Motton, Jr. and Leola Garrett James, additional collateral relatives of decedent George Hardy. Subsequently, both Motton and intervenors filed an amending and supplemental petition adding the State as an additional defendant. Prior to trial these plaintiffs settled with and released the Ascension Parish Ambulance Service and its insurer, Travelers. Further, the Ascension Parish Police Jury was dismissed from this suit by the trial court, leaving the State as the only remaining defendant in both suits.[2]
Following trial, judgment was rendered in favor of plaintiffs and intervenors and against the State, the court determining the damages suffered by each party to be as follows: Audrey Favorite, $60,000, Juanita Motton, $20,000, Mary Jones, $20,000, Eldora Garrett Thomas, Leola Garrett James, Eloise Motton Walker and Isaac Motton, Jr., $20,000, collectively. However, the court reduced the amount awarded to each party to one-half of the stated amounts, for reasons discussed below. The court also awarded special damages to Motton and the intervenors, collectively, in *819 the amount of $10,876.52. The State was cast for all costs. The State appealed this judgment and Favorite, Motton and intervenors have each answered the appeal.

FACTS
The two suits in this matter arise from a vehicular accident which occurred on November 23, 1981. At approximately 1:27 P.M. on that date, Rita Jackson was driving an ambulance owned by her employer, the Ascension Parish Ambulance Service District, south on Highway 1 between Donaldsonville and White Castle. At that time she was transporting two elderly passengers, who had had medical checkups in White Castle, back to their homes in Donaldsonville. The trip did not involve any emergency.
Driving conditions at the time of the accident were good. The weather was clear and visibility was unobstructed. The two-lane asphalt surface of the highway was in excellent condition, bordered on each side by wide, dirt shoulders. There was no oncoming traffic which could have affected Ms. Jackson.
Nevertheless, for no apparent reason, the two right wheels of the ambulance suddenly dropped off the paved surface of the highway and into a rut, which was located on the dirt shoulder immediately adjacent to the pavement. The ambulance quickly traversed the rut, which was at least seven inches deep and approximately two feet wide, and continued in a southerly direction straddling the rut, with its two left wheels on the pavement and its two right wheels on the shoulder. The ambulance then reentered the highway at a point where there was no defect or rut on the shoulder. The distance from the point at which the ambulance first partially left the pavement to the point at which it reentered the roadway was approximately ninety-four (94) feet. The ambulance then traveled in its own lane of traffic for one hundred and thirty-four (134) feet before again partially leaving the pavement and going onto the shoulder. The ambulance traveled a distance of one hundred and twenty-eight feet (128) in this manner. It then once again reentered the roadway, began flipping over and careened across the highway into the northbound lane of traffic and then onto the shoulder adjacent to that lane. At this point the ambulance righted itself and slid across the shoulder and into an adjacent ditch, where it finally came to rest.
Ms. Jackson was thrown out of the ambulance and onto the highway at some point while it was flipping over. She sustained serious injuries, which were ultimately fatal, but was alive and conscious at least twenty to thirty minutes after the accident.
George Hardy was not ejected from the ambulance, but was hanging partially out of it when it finally came to rest. He sustained serious injuries, including a deep laceration running from his left ear, along his jawbone and down to the corner of his mouth. Immediately following the accident, Mr. Hardy was conscious and in great pain. He was taken to a hospital in Baton Rouge where surgery was performed. His condition immediately began to deteriorate and he subsequently died from his injuries, approximately five days after the accident.

STATE'S APPEAL
The State argues the trial court erred in not finding the accident was due solely to the negligence of the ambulance driver, Rita Jackson, and in imposing liability upon the State without finding the rut was a cause in fact of the accident.
The trial court concluded the State was liable for the plaintiffs' damages on the basis of both strict liability and negligence. A finding that the rut or depression was a cause in fact of the accident at issue was essential to the imposition of liability upon the State under either of these theories. While it is true the trial court did not explicitly state the rut was a cause in fact of the accident, this finding is implicit in its reasons for judgment. In any event, unless there is evidence to the contrary, it must be presumed the trial court applied the correct rule of law to the *820 evidence in this case. Blackwell v. Blackwell, 413 So.2d 1331 (La.App. 1st Cir.1982); Helms v. Helms, 349 So.2d 441 (La.App.3d Cir.1977). The learned trial judge's reasons document his capability and experiences and there is nothing in the record to indicate he did not apply the correct rule of law, relative to a finding of liability on the part of the State. In fact, all indications are that the correct rule of law was applied. In its written reasons for judgment, the court specifically lists each of the requirements for the imposition of strict liability, including the requirement that the defect in the thing be a cause of the accident. Thus, it is clear the court was cognizant of the requirement of a causal connection between the rut and the accident in order to impose strict liability upon the State. Although the court did not delineate the specific requirements for liability based on negligence, it is obvious from the written reasons as a whole the court was aware of this requirement and found it to be present.[3]
Furthermore, the record adequately supports the court's implicit finding that the rut was a cause in fact of the accident. Plaintiffs and defendant each presented an accident reconstruction expert, who offered contradictory opinions as to the cause of the accident. Plaintiffs' expert was of the opinion the existence of the rut was the primary cause of the accident. Defendant's expert opined the existence of the rut was only a minor factor, with the primary causes of the accident being the driver's failure to maintain control and overcorrection in her steering of the vehicle. However, all parties agreed dropping from the roadway into a seven inch rut would cause a quite substantial jolt to the ambulance and its occupants. The effect of such a jolt, more likely than not, would be to cause the driver either to completely lose control of her vehicle or to hinder her efforts to regain control.
The trial court apparently accepted the opinion of plaintiffs' expert. The opinions of expert witnesses are not binding on the trial court and are to be weighed in the same manner as any other evidence before the court. Holmes v. Southeastern Fidelity Ins. Co., 422 So.2d 1200 (La.App. 1st Cir.1982), writ denied, 429 So.2d 133 (La.1983). The trial court's evaluation of expert and lay testimony will not be disturbed unless clearly wrong. Id. Upon review of the entire record, we find no manifest error in the conclusion the rut was a contributing factor which, together with the negligence of the ambulance driver, caused the accident in question.

REDUCTION OF APPELLEES' DAMAGE AWARDS
Appellees argue the conduct of Ms. Jackson in inadvertently leaving the paved roadway does not constitute negligence under Rue v. State, Dept. of Highways, 372 So.2d 1197 (La.1979), and the subsequent jurisprudence dealing with highway "drop-off" cases. The plaintiff in Rue was injured when she lost control of her vehicle upon inadvertently driving off the highway and striking a rut on the shoulder. The Court in Rue held that a motorist has a right to assume highway shoulders are maintained in a safe condition, and the State's duty to so maintain them encompasses the foreseeable risk a motorist might inadvertently drive onto the shoulder. In view of these conclusions, the Court held with regard to the plaintiff's conduct:
"We conclude that plaintiff's conduct if indeed it was substandard is no bar to her recovery of damages occasioned chiefly because the Highway Department negligently failed to maintain a safe highway shoulder."at p. 1199. *821 Appellees argue Ms. Jackson can not be considered negligent under the holdings of Rue and its progeny.
Even though this case presents the classic Rue situation, Rue is no longer viable in light of the subsequent adoption of a comparative fault system in this State by Act 431 of 1979, amending La.Civ.Code art. 2323. Appellees, however, argue comparative fault can not be applied in this case because of the express language of the introductory clause to La.Civ.Code art. 2323, which provides "When contributory negligence is applicable to a claim for damages, its effect shall be as follows...." Appellees maintain comparative fault is inapplicable in cases such as the present one in view of this language, because under Rue and the subsequent jurisprudence contributory negligence was not applied in such cases. In effect, appellees argue the legislature intended by this language to exempt from the application of comparative fault those cases in which it has previously been held contributory negligence was not a defense. This argument was considered and rejected by the Supreme Court in the recent case of Turner v. New Orleans Public Service, Inc., 476 So.2d 800 (La. 1985). In Turner, at p. 804, the Court in discussing this issue stated:
"If `contributory negligence' was used instead of `contributory fault' in order to preserve some exceptions in the jurisprudence which permitted plaintiff to recover in full, in spite of some contributory negligence of his own or in spite of a bar to recovery by the application of the last clear chance doctrine, it would seem that such a legislative purpose could have been clearly stated. It is more likely, considering proclivities of lawyers and legislators, that tough details were left for the courts to decide. (Citation omitted.)
Act 431 seems to be the result of an effort to make a comprehensive change in the law governing suits for personal injury or other damage. The inequity in the `all-or-nothing' recovery chances of a personal injury victim was recognized; the all-or-nothing effect of contributory negligence is specifically abolished.
Are we to believe that a policy permitting all-or-nothing recovery was intended to be retained in cases in which a defendant, guilty of fault, raises the defense of assumption of risk? Or misuse of the product? Or willfulness of the plaintiff? Specifically, did the legislators intend to continue the effect of jurisprudence which restricted the application of the contributory negligence doctrine, and allowed full recovery for injury to negligent pedestrians? (Citations omitted.) Did a reform movement, designed to counter the all-or-nothing tort recovery intend to retain a doctrine which allowed full recovery to a driver who parks in a curve on a railroad track? (Citation omitted.) And all without a word? One word would have done the job: `Only when contributory negligence is applicable...'
Legislative intent, frequently employed by courts in statutory interpretation, is so obscure and uncertain as to C.C. 2323 that caution should be employed in attributing any intention to the legislature not expressed in the statute."
The Turner court made it clear it is encumbant upon the courts to determine, as each type of case arises, whether comparative fault is applicable to those cases in which contributory negligence formerly did not bar recovery under prior jurisprudence. See also, Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166, 172 (La.1985).
In Turner the specific issue facing the Court was whether comparative fault principles were applicable to motorist-pedestrian cases. The previous rule established by Baumgartner v. State Farm Mut. Auto Ins. Co., 356 So.2d 400 (La.1978) prior to the adoption of a comparative fault system, was that a pedestrian's contributory negligence did not bar recovery. The primary purposes of the Baumgartner exception were to impose liability upon the party (motorist) whose negligent conduct created the greatest risk of harm and to provide an economic incentive to this party (motorist) to avoid such conduct. However, in Turner *822 (pp. 804, 805) the Court concluded "the `Baumgartner' exception is no longer necessary to accomplish all its legitimate purposes" and "the legislative plan to proportion recovery according to fault is a superior solution...." Thus, the Court determined comparative fault principles were applicable to motorist-pedestrian cases, despite the fact contributory negligence was not previously a defense in such cases.
We believe the situation presented in the instant case is closely analogous to that presented in Turner. As in Baumgartner, we believe one of the major reasons for the result reached in Rue was the harshness of the total bar to recovery which resulted from the application of contributory negligence. In order to avoid this harsh result, the Court concluded the conduct of the motorist in inadvertently straying off the road did not constitute negligence which would bar recovery. We believe the major policy considerations behind Rue were the same as in Baumgartner, i.e., to provide the State with an economic incentive to maintain highway shoulders in a safe condition and to place liability upon the State, whose conduct created a far greater risk of harm to others than did the motorist's conduct. Like the court in Turner, we believe these legitimate interests can now be accomplished by the application of comparative fault, which has the additional advantage of achieving a more equitable result, with each party bearing the burden of its proportionate degree of fault. Accordingly, the rule established in Rue is no longer necessary. For these reasons, we agree with the trial court's conclusion such cases are now governed by the comparative fault doctrine of La.Civ. Code art. 2323.

PERCENTAGE OF NEGLIGENCE OF THE STATE AND MS. JACKSON
Having concluded the existence of the rut was a contributing cause of the accident, together with Ms. Jackson's negligence and that comparative fault applies, the Court in accordance with the principle of comparative fault established by La.Civ. Code art. 2323, assigned 50% fault to each party. Such findings as to percentages of fault are factual and will not be disturbed unless clearly wrong. Varnado v. Continental Ins. Co., 446 So.2d 1343 (La.App. 1st Cir.1984).
In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the Supreme Court offered guidelines for apportioning fault under a system of comparative fault:
"In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed." [Quoting Uniform Comparative Fault Act § 2(b) (1979).]
"In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties."at p. 974.
The greater the risk of harm to others created by a party's conduct, the greater that party's fault. Turner v. New Orleans Public Service Inc., 476 So.2d 800 (La. 1985).
Motorists have a duty both to maintain control of their vehicles and to maintain a proper lookout. If Ms. Jackson had been diligent in her duty to maintain a lookout, she would not have strayed from the roadway. Ms. Jackson was also negligent in driving at an excessive rate of speed (over 55 miles per hour), which undoubtedly *823 contributed to the tragic sequence of events which occurred.
Ms. Jackson's negligent conduct created a risk of harm not only to herself, but also to her passengers, as well as to other motorists traveling on the highway. The harm suffered by plaintiffs was clearly within the scope of the duties Ms. Jackson violated. Further, even though she was driving an ambulance, there were no extenuating circumstances mitigating Ms. Jackson's conduct, since there was no emergency involved in this particular trip. The fact she was driving an ambulance conveying passengers imposed a higher standard of care upon her than required of an ordinary motorist.
The State has a duty to maintain highway shoulders in a reasonably safe condition. Efferson v. State, Through Dept. of T. & Dev., 463 So.2d 1342, 1350 (La.App. 1st Cir.1984), writs denied, 465 So.2d 722 (La.1985). The fault or negligence of the State in the instant case consisted of permitting a dangerous rut, at least 7 inches in depth, to exist on the shoulder of a state highway for an unreasonable length of time. The State admitted a rut of this size would have taken at least a couple of weeks to form. The Department of Transportation maintenance manual suggests highway shoulders be inspected once a week and ruts in excess of 5 inches be treated as emergencies and repaired immediately. If inspections had been performed properly by the State, the rut could have easily been discovered and repaired. During oral arguments before this Court, counsel for the State conceded the State was negligent in allowing this rut to exist. Further, the existence of this rut created an unreasonable risk of harm to a large number of motorists.
After carefully reviewing the duties and conduct of each party, we find the percentages of fault assessed to each party by the trial court were not clearly wrong. Our overview of the respective duties and actions of the parties leads us to conclude fault should be apportioned between the State and Ms. Jackson with 50% being allocated to the State and 50% being allocated to Ms. Jackson.
Since plaintiff, Juanita Motton, and the intervenors settled with and released Ms. Jackson's employer and its insurer, the damage awards made to them must be reduced by 50%, the proportion of fault attributable to Ms. Jackson. See Efferson, supra, at p. 1353. The damage award made to Ms. Jackson's mother, Audrey Favorite, is also subject to a 50% reduction due to Ms. Jackson's negligence.[4]See e.g., Rawls v. Morris, 470 So.2d 531 (La.App. 1st Cir.1985).

QUANTUM
Appellees argue the damages awarded to them were inadequate. Audrey Favorite, mother of decedent Rita Jackson, argues her award should be increased from $60,000 to no less than $145,000.00. Juanita Motton and Mary Jones, half-sisters of decedent, George Hardy, and the remaining intervenors[5] argue each of their awards should be increased from $20,000 to $25,000 ($25,000 collectively in the case of Leola Motton's heirs). The State argues the awards made were excessive.
Rita Jackson was thirty-two years old at the time of her death. She lived next door to her mother, Audrey Favorite, with whom she was close. They normally saw each other daily. Ms. Jackson had allowed her own illegitimate daughter, Gail, to be adopted by her mother. The testimony of Dr. Richard Richoux, a psychiatrist who evaluated Mrs. Favorite in four, one hour sessions during 1983, indicated Mrs. Favorite *824 suffered from a severe and prolonged grief response to the death of her daughter.
As a result of the accident at issue Ms. Jackson suffered severe internal injuries. In addition, as she was thrown from the ambulance onto the highway, her body was severely scraped and skinned, creating painful wounds. She was conscious for approximately twenty to thirty minutes after the accident and was heard to moan in pain during this time.
George Hardy was seventy-one years old at the time of his death. Mr. Hardy, who had never married, lived alone. However, his three sisters each lived nearby and they visited with each other frequently. Prior to the accident, Mr. Hardy's health was generally good, except for some problems resulting from arthritis.
Following the accident, Mr. Hardy was conscious and complained of great pain. He sustained a deep facial laceration, which caused him concern. He underwent surgery on the date of the accident and his condition immediately began to deteriorate. He died approximately four days later while still hospitalized. He suffered pain throughout this period.
The trial court has wide discretion in making an award of general damages. An abuse of this wide discretion must be clearly demonstrated before an appellate court may modify such an award. Rawls v. Morris, supra. After carefully examining the facts and circumstances present in each of these cases, we find no abuse of discretion in either instance. The amounts awarded are well within the range of the trial court's discretion. Coco v. Winston Industries, 341 So.2d 332 (La.1976).

LEGAL INTEREST
Lastly, appellees maintain the judgment of the trial court should be amended to provide for legal interest from the date of judicial demand until paid. Under La.R.S. 13:4203 legal interest automatically attaches on all judgment sounding in tort, regardless of whether such interest was prayed for or mentioned in the trial court's judgment. Broome v. Gauthier, on application for rehearing, 443 So.2d 1127 (La.App. 4th Cir.1984); writ denied, 445 So.2d 449 (La.1984); Steele v. St. Paul Fire & Marine Ins. Co., on application for rehearing, 371 So.2d 843, (La.App. 3d Cir.1979), writ denied, 374 So.2d 658 (La. 1979).
For this reason, formal amendment of the judgment to provide for legal interest is not actually necessary. Broome, supra. Nevertheless, since appellees have raised this issue through an answer to this appeal, we will amend the trial court judgment in this instance to provide for the payment of legal interest.

DECREE
For the above reasons, the judgment of the trial court apportioning fault at 50% to the State and 50% to decedent, Rita Jackson and reducing the amounts awarded to plaintiff and intervenors in proportion to Ms. Jackson's degree of fault, is affirmed. The judgment of the trial court is amended to provide for the payment of legal interest on the awards made from the date of judicial demand until paid. In all other respects the judgment of the trial court is affirmed. Costs in the amount of $515.00 are assessed against the State.
AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] A wrongful death and survival suit was also filed by Gail Lynette A. Favorite, the natural daughter of decedent, Rita Jackson. Prior to the death of Ms. Jackson, Gail Favorite was adopted by her grandmother Audrey Favorite, Ms. Jackson's mother. This suit was apparently filed as a protective measure, the parties being uncertain as to whether Audrey Favorite or Gail Favorite was the proper party to bring this action. La.Civ.Code art. 2315. The trial court concluded Mrs. Favorite was the proper party and rendered judgment dismissing Gail Favorite's suit. Gail Favorite took an appeal from the judgment, but has not filed a brief or raised any arguments before this Court. Accordingly, the issue of whether Audrey or Gail Favorite is the proper party under La.Civ.Code art. 2315 is not before this Court.
[2] The trial court's reason for the dismissal of the suit against the Ascension Parish Police Jury is unclear. However, no objection to this dismissal has been raised by appeal or answer to an appeal. Therefore, this issue is not before the Court.
[3] Actually, it is not even absolutely necessary to establish the presence of all of the elements for recovery under a negligence theory, since all of the elements for recovery under the theory of strict liability have been established: i.e., 1) the thing which caused the damage was in the care or custody of the defendant, 2) the thing had a vice or defect (i.e., created an unreasonable risk of harm to others) and 3) the injuries complained of were caused by the defect. McSweeney v. Dept. of Transp. & Development, 442 So.2d 659 (La.App. 1st Cir.1983).
[4] In its appeal the State also argues the damages awarded by the trial court were excessive. This issue will be considered below, together with the appellees' argument the damages awarded were inadequate.
[5] These intervenors were Eldora Thomas, Leola James, Isaac Motton, Jr. and Eloise Walker, who are the heirs of Leola Motton, George Hardy's sister. Leola Motton survived her brother by approximately two months, but had died by the time this suit was filed.